KAREN P. HEWITT
United States Attorney
CORBIN A. WEISS
Special Assistant U.S. Attorney
California State Bar No. 122961
JARED M. STRAUSS
Special Assistant U.S. Attorney
Florida State Bar No. 18871
MICHELLE J. KANE
Special Assistant U.S. Attorney
California State Bar No. 210579
Federal Office Building
880 Front Street
San Diego, California 92101-8893
Telephone: (619) 446-3885
corbin.weiss@usdoj.gov
jared.strauss@usdoj.gov
michelle.kane@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   vs.<br><br><br>PHILIP JAMES BIDWELL,<br>JEFFREY A. LIGHT,<br>DOLORES LOVIN, and<br>MARY ARONSON,<br><br>        Defendants. | )   Case No.: Case No. 07cr2016-IEG<br>)<br>)   GOVERNMENT'S OMNIBUS RESPONSE<br>)   TO DEFENDANTS' MOTIONS TO<br>)   DISMISS FOR VAGUENESS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

      The UNITED STATES OF AMERICA, by and through its undersigned counsel, hereby responds to Defendant Philip James Bidwell's Motion to Dismiss Criminal Charges Which Congress Does Not Currently Believe Constitute A Crime [Docket Entry #313]; Defendant Jeffrey A. Light's Motion to Dismiss Indictment [Docket Entry #321]; and Defendants Dolores Lovin and Mary Aronson's Joint Motion to Dismiss the Indictment on Due Process Grounds

1
2
[Docket Entry #327]. Because these three motions make similar arguments regarding due process and vagueness, the United States responds to all three in this single pleading.

3
4
5
6
7
8
The Defendants' motions should all be denied. The central fallacy of the Defendants' arguments is an erroneous assumption that their use of the Internet somehow transformed conduct prohibited under established law into unregulated behavior. While the Internet enabled their conduct to reach a profitable scope, their conduct is no less prohibited by the Controlled Substances Act than if they had been committing the same acts by telephone or in person.

9
10
11
12
13
14
15
16
17
18
19
Courts have consistently held that the Controlled Substances Act's provisions prohibiting distribution of controlled substances unless pursuant to a prescription issued for legitimate medical purpose by a practitioner acting in the usual course of professional practice are not void for vagueness. Courts have come to this conclusion with respect to doctors, pharmacists, and non-practitioners alike, including individuals involved in operating Internet pharmacies. Any contentions that the Defendants had insufficient knowledge of the nature of Affpower's operation are factual issues to be decided at trial. Finally, one house of Congress's passage of a bill more specifically regulating distribution of controlled substances over the Internet neither undermines the Government's theory nor affects the clarity of pre-existing law.

20
I.      LEGAL STANDARD

21
22
23
24
25
Under the Fifth Amendment's Due Process Clause, a criminal statute is void for vagueness if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute or is so indefinite that it encourages arbitrary and erratic arrests and convictions. *United States v. Williams*, – U.S. –, 128 S. Ct. 1830, 1845, 170 L. Ed.

26
27
28

2d 650 (2008) (internal citations omitted).[1]  However, the vagueness doctrine "is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Arnett v. Kennedy*, 416 U.S. 134, 159-60, 94 S. Ct. 1633, 40 L. Ed. 2d 15 (1974) (internal citations omitted).  A statute is not unconstitutionally vague if it "requires a person to conform his conduct to an imprecise but comprehensible normative standard;" rather it is only unconstitutional where "no standard of conduct is specified at all." *United States v. Moore*, 109 F.3d 1456, 1467 (9th Cir. 1997) (citing *Village of Hoffman Estates v. Flipside*, *Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7, 102 S. Ct. 1686, 29 L. Ed. 2d 214 (1971)).  Finally, due process notice is provided when a statute has been judicially construed to prohibit identical conduct. *Wainwright v. Stone*, 414 U.S. 21, 22-23, 94 S. Ct. 190, 38 L. Ed. 2d 179 (1973).

For purposes of a motion to dismiss a criminal indictment, the allegations in the indictment are presumed to be true. *United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993).

## II.    STATEMENT OF FACTS

The Indictment describes, at length, the Affpower enterprise's structure and operation, and the Court is familiar with the allegations contained therein.  For purposes of the instant motion, the Indictment alleges, in sum, that the Affpower enterprise, which included affiliate marketers such as Defendants Bidwell and Light, pharmacists like Defendants Lovin and Aronson, doctors, credit card processors, and others, distributed both controlled and non-controlled prescription pharmaceuticals to customers in all fifty states between about August

---

[1] Defendant Light repeatedly invokes the Fourteenth Amendment's Due Process Clause.  Because this case is a federal prosecution of violations of a federal statute, it is the Fifth Amendment that applies, not the Fourteenth. *See Dusenbury v. United States*, 534 U.S. 161, 167, 122 S. Ct. 694, 151 L. Ed. 2d (2002).  The standard for determining whether a statute is impermissibly vague is the same under either clause. *See Colautti v. Franklin*, 439 U.S. 379, 390, 99 S. Ct. 675, 58 L. Ed. 2d 956 (1979).

2004 through June 2006. Customers who lacked prescriptions from personal physicians would seek prescription drugs on the Internet. Customers would first visit the websites run by affiliate marketers, like Defendants Bidwell and Light, and choose the particular drug and quantity they desired. By clicking on a link for a particular drug, they would be transferred to a merchant website, where they would complete an online health questionnaire.

Affpower contracted with licensed doctors in a handful of states, who would review the health questionnaires. Based solely on the health questionnaires, and without conducting any physical examinations or having any additional contact with the customers, the doctors would decide whether to approve each customer order. Affpower doctors commonly reviewed hundreds, and occasionally over one thousand, health questionnaires per day, often reviewing each questionnaire for only one to five seconds. In some cases, a member of the Affpower enterprise who was not a doctor would review and approve customer orders by misappropriating the identity of a licensed doctor. Affpower also recruited licensed pharmacies, like Defendants Lovin and Aronson's St. Vrain Pharmacy, to fill the prescription drug orders. The pharmacies were paid fees or commissions, in addition to product costs, for each order they filled.

III.   ANALYSIS

**A.  The Controlled Substances Act**

The Controlled Substances Act (CSA), 21 U.S.C. §§ 801-971, governs all distribution of controlled substances in the United States. All of the defendants are charged with illegal distribution of controlled substances and conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846. Section 841(a)(1) provides that: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally to … distribute, or dispense … a controlled substance." In 21 U.S.C. § 822, the CSA provides a limited exception

to section 841's broad, general prohibition by authorizing individuals who have registered with the Attorney General to distribute controlled substances "to the extent authorized by their registration and in conformity with the other provisions of this subchapter." Pursuant to authority to create regulations relating to the registration and control of distribution of controlled substances under the CSA,[2] in 1971 the Attorney General promulgated 21 C.F.R. § 1306.04.

Section 1306.04(a) provides that, "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Thus, unless a controlled substance is distributed pursuant to a prescription written "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,"[3] the distribution violates section 841. *See United States v. Moore*, 423 U.S. 122, 96 S. Ct. 335, 46 L. Ed. 2d 333 (1975).

### B.  "In the Usual Course of Professional Practice" is Not Unconstitutionally Vague.

The Defendants argue that the CSA cannot be applied to them because the statute, and, specifically, the phrase "in the usual course of professional practice," are too vague to give them fair notice that their conduct was illegal. Specifically, Defendants Bidwell and Light contend that, as "mere marketers,"[4] they are not the targets of the CSA and cannot be expected to know what the "usual course of professional practice" excludes. These arguments ignore a litany of

---

[2] 21 U.S.C. § 821.

[3] The CSA also contains other exceptions, none of which are relevant here.

[4] As argued below, factual disputes over the Defendants' role in, and knowledge of, Affpower's activities must be determined at trial. Nevertheless, Defendants Bidwell and Light's description of themselves as "mere marketers" mischaracterizes and minimizes their role in the Affpower enterprise. As alleged in the Indictment, the affiliates were more akin to salesmen or brokers than advertisers. They were not like billboards, merely providing information or suggesting that customers visit Affpower's merchant sites. Rather, they were the gateway through which sales were initiated, determining the ultimate price the customers paid and routing them to the central merchant sites. Without the affiliate sites initiating sales, Affpower would have had no sales at all.

case law interpreting and applying the CSA to both practitioners and non-practitioners, including those operating Internet pharmacy operations virtually identical to Affpower.

      1.   "In the Usual Course of Professional Practice" is Not Unconstitutionally Vague Generally.

Courts have consistently rejected arguments that "in the usual course of professional practice" is unconstitutionally vague. *See United States v. Rosenberg*, 515 F.2d 190, 197-198 (9th Cir. 1975) (noting that the phrase had been used in statutes since 1914 and courts had shown "ease and consistency" in interpreting the phrase); *United States v. Jobe*, 487 F.2d 268, 269 (10th Cir. 1973); *United States v. Collier*, 478 F.2d 268 (5th Cir. 1973); *United States v. Hayes*, 595 F.2d 258 (5th Cir. 1979); *United States v. DeBoer*, 966 F.2d 1066, 1068-69 (6th Cir. 1992); *United States v. Prejean*, 429 F. Supp. 2d 782, 804 (E.D. La. 2006); *United States v. Quinones*, 536 F. Supp. 2d 267, 274 (E.D.N.Y. 2008); *United States v. Hilst*, No. 07-10079, slip op. at 15-16 (D. Kan. Oct. 18, 2007) (unpublished)[5] ("Every court to consider the issue has found that the law gives fair warning of what conduct is prohibited and is not impermissibly vague."). Significantly, the Defendants have not cited a single case to the contrary.

The precise contours of the "usual course of professional practice" and whether defendants have gone outside it is a question for the jury and must be considered on a case-by-case basis. *Collier*, 478 F.2d at 272; *United States v. Singh*, 54 F.3d 1182, 1187 (4th Cir. 1995); *Quinones*, 536 F. Supp. 2d at 271, 274. However, that does not make the statute vague. The statute "need not delineate the precise circumstances constituting the bounds of permissible practice." *Collier*, 478 F.2d at 272. The phrase does not invite arbitrary enforcement because it has an objective meaning grounded in "what the medical profession would generally do in the

---

[5] A copy of this opinion is appended.

circumstances." *Quinones*, 536 F. Supp. 2d at 274. In fact, the Ninth Circuit observed that "it is difficult to see how the language can be made more precise and at the same time ban the undesirable conduct on the part of physicians which Congress intended to make illegal and subject to sanction." *Rosenberg*, 515 F.2d at 198.

    2.   <u>The CSA Constitutionally Applies to Non-Practitioners, Including the Defendants.</u>

    Courts have also consistently rejected Defendants Bidwell's and Light's contentions that, as non-practitioners, the CSA cannot apply to them or that they cannot be expected to know what conduct falls outside "the usual course of professional practice." For decades, courts have upheld convictions of non-practitioners who conspire to distribute, or aid and abet the distribution of, controlled substances based on prescriptions issued outside the course of medical practice. *See United States v. Green*, 511 F.2d 1062 (7th Cir. 1975) (building/pharmacy owner); *United States v. Hicks*, 529 F.2d 841 (5th Cir. 1976) (security guard with a 4th grade education); *United States v. Mahar*, 801 F.2d 1477, 1487 (6th Cir. 1986) (pharmacy manager); *United States v. Vamos*, 797 F.2d 1146, 1153 (2d Cir. 1986) (nurse/office manager); *United States v. Johnson*, 831 F.2d 124 (6th Cir. 1987) (clinic administrative manager); *United States v. DeBoer*, 966 F.2d 1066, 1068-69 (6th Cir. 1992) (pharmacy manager/technician); *United States v. Prejean*, 29 F. Supp. 2d 782, 804 (E.D. La. 2006) (clinic owner). *See also*, *United States v. Albert*, 675 F.2d 712, 715-16 (5th Cir. 1982) (rejecting argument that laypersons cannot conspire with a doctor to illegally dispense drugs); *United States v. Hilst*, No. 07-10079, slip op. at 5-7 (denying motion to dismiss by a computer technician employed by a pharmacy participating in an online pharmacy operation).[6] Again, the Defendants cite no cases to the contrary.

---

[6] In fact, Affpower, under the name "Safe Trust Processing," was one of the two online pharmacy enterprises in which the defendants in *Hilst* participated.

In each of the above-cited cases, the court found that there was sufficient evidence of the non-practitioners' knowledge of and participation in distributions of controlled substances outside the course of professional practice to find them guilty of violating § 841, even if the non-practitioner did not have any particular medical training. The determining factor of guilt is not the defendant's specific role in the scheme, but rather his knowledge of, and voluntary participation in, the acts taking place. As these cases make clear, 21 U.S.C. § 841's prohibition on distributing controlled substances applies to "any person" who distributes – or conspires to distribute or aids and abets the distribution of – a controlled substance based on a purported prescription issued outside the usual course of professional practice. *See, e.g., Johnson*, 831 F.2d at 128.

In fact, within the last year two district courts have flatly rejected void-for-vagueness arguments by non-practitioners participating in Internet pharmacy operations. In *United States v. Hernandez*, the court denied motions to dismiss by a pharmacy owner and two corporate defendants, holding that "[t]he . . . claim that § 841 is unconstitutional as applied to the defendants in this case is foreclosed by *Moore* . . . and other decisions which have rejected similar arguments, including the claim that the rule of lenity should apply." No. 07-60027-CR, 2007 WL 2915854 (S.D. Fla. Oct. 4, 2007) (citing *Collier*, *DeBoer*, and *Rosenberg*) (adopted by the district court in 2008 WL 559375 (S.D. Fla. Feb. 21, 2008)). In rejecting the same argument from three website owners whose websites permitted customers to order controlled substances by completing online questionnaires, another district court ruled:

> [A] reasonable person reading § 841(a)(1) is on notice that distributing controlled substances is illegal unless it fits within the exception; it is not too great a burden to require that person to investigate the extent of the exception before plunging ahead. Put another way, it is disingenuous that the moving defendants seek to invoke the exception as legalizing their actions, but then claim that they do not know what the exception means.

*Quinones*, 536 F. Supp. 2d at 274.  The fact that the CSA does not specifically mention "affiliate marketers," just as it does not mention building owners, security guards, administrative managers, or website owners, is inapposite.

### 3. Defendants Had Fair Notice That Issuing Prescriptions Without Physical Examinations, Including Pursuant To An Online Questionnaire, Is "Outside the Usual Course of Professional Practice."

Furthermore, the Defendants' claim that they had no notice that an Internet pharmacy operation like Affpower, where doctors issue prescriptions based solely on online health questionnaires without any physical examination for drugs pre-selected by patients, was distributing drugs outside the usual course of professional practice is simply untenable.  The Defendants protest that the CSA does not specifically address Internet pharmacies or prescriptions distributed based on online questionnaires.  However, Defendants erroneously fixate on the use of the Internet, as if standards developed in an off-line context suddenly no longer apply.[7]

Evidence of cursory or non-existent physical examinations has been one of the most consistent indications of conduct outside the usual course of professional practice under the CSA.  Again, due process notice is provided when a statute has been judicially construed to prohibit identical conduct.  *Wainwright v. Stone*, 414 U.S. 21, 22-23, 94 S. Ct. 190, 38 L. Ed. 2d 179 (1973).  As one court rejecting a virtually identical void-for-vagueness argument from participants in an online pharmacy observed, "In almost every case, one of the clear-cut signs that the conduct was outside the usual course of medical practice was the fact that prescriptions

---

[7] *See Quinones*, 536 F. Supp. 2d at 271 ("That the moving defendants allegedly carried out their activities through the Internet is of no consequence."); *Hernandez*, 2007 WL 2915854 at *9 ("[Defendants'] arguments ignore the fact that the indictment in this case is not premised upon any statute or rule of law that specifically precludes the sale of prescription drugs over the Internet.  It is, instead, premised upon a theory that the drugs in this case were prescribed and distributed outside the bounds of professional medical practice.")

were issued without the patient ever having been given any meaningful physical examination." *United States v. Hilst*, No. 07-10079, slip op. at 17 (D. Kan. Oct. 18, 2007) (unpublished). *See, e.g.*, *Moore*, 423 U.S. at 126, 142 (defendant gave "inadequate physical examinations or none at all."); *Rosenberg*, 515 F.2d at 192 ("At no time did Dr. Rosenberg give any of the agents a physical examination."); *Jobe*, 487 F.2d at 269 (patients "were able to obtain prescriptions within a few minutes after an interview and without any actual physical examination."); *United States v. Smurthwaite*, 590 F.2d 889, 890 (10th Cir. 1979) (no physical exam); *United States v. Varma*, 691 F.2d 460, 464 (10th Cir. 1982) (doctor's physical examinations were "patently too short and inadequate"); *Mahar*, 801 F.2d at 1487 (evidence of physical exams lasting on 5-8 minutes "permitted the jury to find that it was impossible for the Clinic to conform to the usual course of medical practice."); *United States v. Chin*, 795 F.2d 496, 500 (5th Cir. 1986) (abbreviated physical examinations are probative of whether a legitimate medical purpose exists); *Johnson*, 831 F.2d at 126 (doctor performed "perfunctory" examinations); *United States v. Leal*, 75 F.3d 219, 222 (6th Cir. 1996) (abrogated on other grounds by *United States v. Kennedy*, 107 Fed. Appx. 518 (6th Cir. 2004)); *United States v. Armstrong*, No. 05-130, 2007 WL 809509 (E.D. La. Mar. 14, 2007) (extremely high volume of patients, short patient visits, lack of physical examinations, and lack of monitoring for addiction were facts supporting finding of prescribing without a legitimate medical purpose and outside the course of professional practice). Again, as the *Hilst* court observed, "Case law further provides – as does common sense – that issuing prescriptions for addictive substances without any examination of the persons involved is suspect and outside normal medical practice." *Hilst*, No. 07-10079, slip op. at 18.

Other facets of Affpower's operation have also been found to be evidence of conduct outside the usual course of professional practice, including only charging patients if a

prescription was written,[8] issuing prescriptions for a particular controlled substance chosen by the patient,[9] and failing to keep patient records.[10]

As if these cases were not enough to demonstrate that Affpower's operations were exceeding the bounds of the usual course of professional practice, in September 2004[11] the Tenth Circuit upheld the conviction of a doctor who participated in a nearly identical Internet pharmacy operation. *See United States v. Nelson*, 383 F.3d 1227 (10th Cir. 2004). In *Nelson*, a licensed physician was convicted of conspiring with the operators of an Internet pharmacy to illegally distribute controlled substances. As with Affpower, the Internet pharmacy in *Nelson* enabled customers to order prescription drugs through a website by completing online medical history questionnaires. *Id*. at 1230. Like the Affpower doctors, Nelson would review each order based solely on the questionnaires and without physically examining the customers and approved between 90-95% of all orders. *Id*. at 1229-30. The approved orders were then routed through Nelson's co-conspirator's brick-and-mortar pharmacy and mailed to patients. *Id*. at 1229. Based on these facts, the Tenth Circuit held that there was sufficient evidence for a jury to find "beyond a reasonable doubt that Nelson participated in a conspiracy to distribute controlled prescription drugs outside the usual course of professional practice." *Id*. at 1230. The Fifth Circuit reached the identical conclusion in reviewing the conviction of a pharmacist for participation in the same conspiracy. *United States v. Fuchs*, 467 F.3d 889 (5th Cir. 2006).

//

//

---

[8] *See United States v. Kirk*, 584 F.2d 773, 779 (6th Cir. 1978).

[9] *See, e.g., Varma*, 691 F.2d at 462; *Kirk*, 584 F.2d at 783; *Smurthwaite*, 590 F.2d at 890; *Johnson*, 831 F.2d at 126.

[10] *See United States v. Larson*, 722 F.2d 139, 142 (5th Cir. 1983) (failing to produce records indicates lack of compliance with customary medical practice).

[11] While the Indictment alleges that Affpower began operation in August 2004, the vast majority of the charged conduct, including substantive counts and racketeering acts, occurred after September 2004.

4. <u>Factual Issues About Defendants' Knowledge or State of Mind Must Be Determined At Trial.</u>

Defendants factual assertions that they were "mere marketers" or relied on advice from their co-conspirators are inappropriate at this stage. Defendants Bidwell and Light continuously characterize their role in Affpower, and their knowledge and control of Affpower's activities, as "limited." For some reason the Defendants appear to believe that initiating sales and referring customers to Affpower over the Internet makes them any less culpable than, say, someone standing on a street corner referring people to a doctor he knows is handing out prescriptions after scant examinations. To the extent the Defendants' assertions that they are "mere marketers" are meant to suggest that they were legally incapable of violating the CSA or knowing that the CSA applied to them or their activities, or that they were entitled to blindly rely on the judgments of the doctors and pharmacists involved, the above case law and analysis demonstrates that the Defendants are wrong. *See, e.g., Hicks*, 529 F.2d at 844 (upholding conviction of security guard for conspiring with doctor who he knew was issuing prescriptions outside the usual course of professional practice); *Hilst*, No. 07-10079, slip op. at 4-8 (finding that layman who knowingly helps carry out a scheme with a physician to issue "bogus" prescriptions is liable under § 841); *Vamos*, 797 F.2d at 1153 (nurse/office manager was "not free to unreasonably rely on the judgment" of her doctor-employer).

To the extent the Defendants are suggesting that they did not know how Affpower operated, they are raising factual issues which must be determined at trial. The same applies to claims that the Defendants relied on representations made by their co-conspirators and the extent to which any of that reliance was reasonable or in good faith.[12] For purposes of a motion to

---

[12] While these statements are irrelevant to the instant motion, the United States believes it necessary to correct and clarify some of Defendant Bidwell's entries from the government's *Brady* letter. *See* Def. Bidwell Mot. at 6-7. The

dismiss a criminal indictment, the allegations in the indictment are presumed to be true. *United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993). The United States acknowledges that it must prove at trial that the Defendants knew sufficient facts about Affpower's operations from which they could reasonably conclude that the "prescriptions" issued and filled by Affpower's doctors and pharmacists were issued outside the usual course of professional practice.[13] The United States can and will present sufficient evidence at trial to meet and exceed this standard; attempting to refute the Defendant's factual assertions here would be inappropriate, particularly given the volume of such evidence.

## C. The Senate's Recent Passage of Internet Pharmacy Legislation Does Not Imply that Internet Pharmacies Are Currently Legal or that the Current CSA is Vague.

Defendants Bidwell, Light, Lovin, and Aronson all point to a proposed bill in Congress, the Ryan Haight Online Pharmacy Consumer Protection Act, S. 980, 110th Cong. (2008) (hereinafter, "the bill"), as evidence that the CSA either does not currently criminalize their alleged conduct or, if it does, that the CSA is unconstitutionally vague. However, the Defendants' arguments all must fail. In addition to the fact that this bill has not yet been enacted,

---

last bullet point of page 6 incorrectly attributes the quoted statements to David Glass. The statements were actually made by Dr. Chandresh Shah while he was speaking to David Glass. The first bullet point, indicating that Glass told affiliates that "the business was legal," omits that Glass told affiliates this during the operation of Rx Medical One, Affpower's precursor that was subsequently shut down by the DEA in 2004. Furthermore, while Defendant Bidwell refers to the cited entries as admissions that "Bezonsky and Glass repeatedly told Mr. Bidwell and other affiliates that the Affpower business model was legal," none of the cited entries refers to Defendant Bidwell. In fact, most of the entries cited – Bezonsky's notes, Harrington's statements to investigators, Shah's statement to Glass, or the three statements from Glass's grand jury testimony on page 7 – make no connection with Defendant Bidwell or other affiliates at all.

[13] It is important to recognize that this requirement is not the same as needing to prove that the Defendants knew that they were violating the CSA. Section 841 criminalizes "knowingly or intentionally" distributing controlled substances; it does not impose a willfulness standard. While "willfulness" requires a showing of a specific intent to violate the law, "knowledge" requires only that the defendant "realize what he or she is doing and did not act through ignorance, mistake, or accident." *United States v. Mendelsohn*, 896 F.2d 1183, 1188 (9th Cir. 1990). Thus, the Defendants are guilty if they intentionally participated in Affpower and knew sufficient facts about the operation from which they could reasonably conclude that the distributions of controlled substances were occurring outside the usual course of professional practice, even if they did not believe they were violating the CSA. Ignorance of the law is not an excuse. *United States v. Vasarajs*, 908 F.2d 443, 448 (9th Cir. 1990).

and thus cannot represent the intent of Congress, the bill is more likely intended to affirm and cement the existing interpretations of the CSA as applied to Internet pharmacies in cases like *Nelson* and *Fuchs*. At the very least, the bill's sponsors' intent vis-à-vis existing CSA prohibitions is unclear and at any rate does not control interpretation of the earlier enacted provisions. Furthermore, even if the bill, if enacted, were to make the existing CSA clearer, this does not indicate that the existing CSA is unconstitutionally vague.

    1. <u>"Congressional Intent" Cannot Be Divined From an Unenacted Bill.</u>

      Preliminarily, it is important to note that the bill has not been enacted. The Senate passed the bill on April 1, 2008, but its companion bill in the House of Representatives (H.R. 6353) has received no action other than being referred to committee. Thus, the bill does not represent the intent of Congress; Congress, as a whole, has not spoken. *See Physicians Nat. House Staff Ass'n v. Fanning*, 642 F.2d 492, 509 (D.C. Cir. 1980) (Wright, C.J., dissenting) ("[T]he action of one house of Congress cannot be a basis from which to draw inferences about the intentions of the whole Congress."). Discerning the precise intent of Congress is difficult in the best of circumstances. Given that the bill has not passed, the Court should be wary of drawing any firm conclusions from its current provisions. *Cf. United States v. Wise*, 370 U.S. 405, 411, 82 S. Ct. 1354, 8 L. Ed. 2d 590 (1962) ("The interpretation placed upon an existing statute by a subsequent group of Congressmen who are promoting legislation and who are unsuccessful have no persuasive significance here."). It is inappropriate to try to divine what the intent of Congress might be from a bill that has not been enacted rather than relying on the established law of the existing CSA and the extensive case law interpreting it.

//

//

2. <u>The Bill's Proposed Amendments Do Not Imply That Existing Law Does Not Prohibit Defendants' Conduct.</u>

Were the bill to pass in its present form, it would not necessarily imply that the existing CSA does not already prohibit distribution based on a prescription without an in-person medical examination or does not already apply to non-practitioner conspirators and aiders and abettors like the Defendants Bidwell and Light. "An amendment does not necessarily indicate that the unamended statute means the opposite." *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994); *United States v. Hockings*, 129 F.3d 1069, 1072 (9th Cir. 1997).

In *Hockings*, the Ninth Circuit faced an analogous situation, in which Congress had updated an older statute to more clearly account for recent technological advances. Defendant Hockings was charged with transporting, in interstate commerce, "visual depictions" of minors engaging in sexual activity, after he was found with a computer disc containing GIF files from which pornographic images could be retrieved. 129 F.3d at 1070. At the time of his offense, the statute under which Hockings was charged defined "visual depiction" to include undeveloped film and video-tape, but made no mention of data stored on a disc. *Id*. at 1071. However, Congress subsequently amended the statutory definition of "visual depiction" to specifically include "data stored on computer disk." *Id*. Hockings argued that the subsequent amendment demonstrated that the pre-amendment definition did not encompass data stored on a computer disk. The Ninth Circuit squarely rejected Hockings' argument, finding that Congress may amend a statute for any number of reasons, including to clarify existing law. *Id*. at 1072. The Court also rejected Hockings' argument that the statute was void for vagueness. *Id*.

Were the bill at issue here to be enacted, it would present the analogous situation as in *Hockings*. The bill can properly be viewed as Congress's attempt to clarify the existing CSA's application in light of new technology and methods being used to violate it, without an

implication that the existing provisions do not already prohibit such conduct. Just as Congress amended the bill in *Hockings* to confirm that the definition of "visual depictions" included computer data – a conclusion that could have been reached even under the pre-amendment statute – the bill here would be confirming the conclusion that courts across the country have already reached under the existing CSA: that for a prescription to be validly issued for a legitimate medical purpose and in the usual course of professional practice, it must be based on an in-person examination, and that non-practitioners who conspire with or aid and abet practitioners are liable for violations.

One district court has already agreed with this reasoning in rejecting an identical argument by Internet pharmacy defendants with regard to the same bill at issue here.

> Here, it may well be that Congress intended the proposed legislation to proscribe, by a clear-cut, *per se* rule, the distribution of controlled substances over the Internet without a face-to-face meeting between patient and doctor; it does not follow that the same conduct is not within the embrace of the current prohibition of distribution outside the usual scope of professional practice.

*Quinones*, 536 F. Supp. 2d at 273.

3. The Bill Is More Reasonably Interpreted As Affirming Existing Case Law.

The more reasonable interpretation is that Congress intends the bill to confirm and reinforce the holdings of *Nelson*, *Fuchs*, and the myriad other cases cited above interpreting and applying the existing law to Internet pharmacies: that prescriptions based solely on an online questionnaire, without any in-person examination, are invalid, and that non-practitioner conspirators and aiders and abettors are already liable for violations of § 841. As Defendant Bidwell himself cites, courts must presume that Congress is aware of existing law when enacting legislation. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990); *see also* Def. Bidwell Mot. at 8. Thus, the Court must presume that Congress is aware that federal courts have consistently

interpreted the CSA, and the corresponding regulations, to mean that prescriptions issued without an in-person examination, including those based on an online questionnaire, fall outside the usual course of professional practice and to apply to non-practitioners.  The proposed bill does nothing to alter or qualify those interpretations, implying that the bill's authors approve of them. Furthermore, Congress knows, particularly in light of *Gonzales v. Oregon*,[14] that the best way to solidify those interpretations, and to insulate them from future shifts in state law or medical practice, is by writing them directly into the statute.  Therefore, rather than viewing the bill's relevant provisions as an attempt to expand the CSA to cover new conduct or to plug holes in the existing statute, it makes more sense that the bill is simply approving of what the courts have already done.[15]

   4. <u>The Current Senate's Beliefs Cannot Control Interpretation of the Existing Statute.</u>

  The foregoing analysis demonstrates that the Senate's intent in passing the bill is probably not to newly criminalize Internet pharmacy conduct, but rather to reaffirm existing applications of the existing CSA to that conduct.  At the very least, the import of the Senate's

---

[14] 546 U.S. 243, 126 S. Ct. 904, L. Ed. 2d 748 (2006).  In *Gonzales*, the Supreme Court held that the Attorney General could not, alone, nullify Oregon's assisted-suicide law by declaring, through an interpretive regulation, that assisted-suicide is not a "legitimate medical purpose."  As the Court found, the standards of the medical profession, as regulated by the states, inform what it means to legitimately practice medicine.  However, the Court also noted that Congress can establish uniform national standards of medical practice through the CSA, as it had with regard to treatment of narcotic addiction.  *Id*. at 271.  Thus, Congress knows that if it wants in-person medical examinations to remain the standard for professional medical practice, as it is today, the surest course is to cement that standard into the statute itself.

[15] Defendants argue that two lines in the Congressional Budget Office's Cost Estimate (Appendix B to Defendant Bidwell's Motion), stating that the bill establishes "new crimes" and would enable the government to "pursue cases it otherwise would not be able to prosecute," supports their argument that Congress believes the CSA does not currently prohibit their conduct.  However, these quotes are of little significance.  First, these are not the words of actual legislators spoken or included in a committee report.  The quotes are from a cost estimate, written by an office staffed independently from legislative offices, that focuses on a bill's economic impact rather than its legal significance.  Thus, it is a weak indication of Congressional intent, if any indication at all.  Second, the statements do not indicate to what "new crimes" the estimate is referring.  In addition to the provisions at issue here, the bill adds a host of new requirements, including new reporting, registering, and licensing requirements.  The cost estimate could be referring to the "new crimes" of making false statements regarding the new reporting provisions or distributing for an Internet pharmacy that is not registered under the new requirements.  *See* S. 980, 110 Cong. §(f)(2)(A) & (E).

actions are unclear and it cannot be assumed, *ipso facto*, that the Senate believes that the existing law does not already prohibit the Defendants' conduct.  However, even if the Senate did believe that the Defendants' conduct is not currently prohibited, this view cannot control interpretation of the existing CSA.  *See O'Gilvie v. United States*, 519 U.S. 79, 90, 117 S. Ct. 452, 136 L. Ed. 2d 454 (1996) ("[T]he view of a later Congress cannot control the interpretation of an earlier enacted statute."); *United States v. Price*, 361 U.S. 304, 313, 80 S. Ct. 326, 4 L. Ed. 2d 334 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").  The litany of case law presented earlier – establishing that a lack of in-person physical examinations is evidence of conduct "outside the usual course of professional practice;" that prescribing based solely on online health questionnaires is evidence of conduct "outside the usual course of professional practice;" and that non-practitioner conspirators and aiders and abettors are subject to the CSA – is all based on the provisions of the CSA, its accompanying regulations, and the intent of Congress when the CSA was actually enacted.  As *O'Gilvie* teaches, a current supposed belief of the Senate that new provisions are needed to cover Internet pharmacies cannot change the already established interpretations that the existing CSA prohibits the Defendants' conduct.

   5.   The Failure of Previous Bills Is of No Significance.

   Defendant Bidwell's motion cites several failed bills from previous Congresses that, like the current bill, would require an in-person medical evaluation to issue a valid prescription. Defendant Bidwell places particular emphasis on the fact that these failed bills, *unlike* the current bill, would have exempted advertisers without ownership or control over the person dispensing

the drugs.[16]  It is unclear under what logic Defendant Bidwell believes that these failed bills

support his motion.  Under his current theory that proposed legislation indicates a desire or need

to change the law from its current status, the previous bills would seem to suggest that Congress

thought advertisers could be already be liable and needed to be exempted.  If he thinks that the

previous bills' inclusion of immunity for advertisers indicated a belief by Congress that affiliate

marketers should not be liable, he cannot maintain that Congress still feels that way, given both

that these bills failed and the current bill contains a conflicting provision.  Perhaps he thinks that

the previous bills failed because Congress already thought affiliates were exempt but that the

current Congress now thinks that they should be liable and thus is trying to change the law.  Or

perhaps he thinks (or will argue in reply) that the failure of Congress to enact any these bills,

including the current one, should imply that Congress does not think in-person medical

examinations are necessary for prescriptions issued over the Internet – despite the fact that one

could just as easily imply from the bills' failures that Congress already thinks the proscribed

conduct is illegal.

      The twisting and shape-shifting of these arguments only re-emphasizes the point that it is

hazardous, and unhelpful, to draw inferences from bills that Congress declines to, or has yet to,

pass.  "Logically, several equally tenable inferences could be drawn from the failure of Congress

to adopt an amendment in light of the interpretation placed upon the existing law by some of its

members, including the inference that the existing legislation already incorporated the offered

change."  *Wise*, 370 U.S. at 411.  *See also Price*, 361 U.S. at 310-311 ("[N]on-action by

Congress affords the most dubious foundation for drawing positive inferences. . . .no inference

---

[16] By contrast, the current bill clearly lists "serving as an agent, intermediary, or other entity that causes the Internet to be used to bring together a buyer and seller to engage in the dispensing of a controlled substance in a manner not authorized by section 303(f) or 309(e)" as an example of violating § 841.

can properly be drawn from the failure of Congress to act."); *United States v. Craft*, 535 U.S. 274, 287, 122 S. Ct. 1414, 152 L. Ed. 2d 437 (2002) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute.") (internal citations omitted). Because of the difficulty in discerning Congressional intent from unpassed bills, the Court here should simply focus on the established statute and existing case law.

      6.   <u>The Current CSA Is Not Unconstitutionally Vague Simply Because the Proposed Bill Could Make It Clearer.</u>

Finally, the Defendants argue that the existing CSA is unconstitutionally vague because, juxtaposed to the unenacted bill, the bill's language more clearly prohibits their precise conduct. This claim is meritless. In deciding whether a statute is void for vagueness, the focus must be on the language of the statute at issue, not language Congress could theoretically have enacted or may consider enacting years after the Defendants' alleged conduct was committed. "The fact that Congress might, without difficulty, have chosen '(c)learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." *United States v. Powell*, 423 U.S. 87, 94, 96 S. Ct. 316, 46 L. Ed. 2d 228 (1975) (quoting *United States v. Petrillo*, 332 U.S. 1, 7, 67 S. Ct. 1538, 91 L. Ed. 1877 (1947)); *see also United States v. Moore*, 109 F.3d 1456, 1467 (9th Cir. 1997). The extensive case law cited earlier demonstrates that, for decades, courts across the country have examined the existing CSA and found it constitutionally sufficient, both as to practitioners and non-practitioners. That Congress may now be considering more precise language is irrelevant.

    **D.**    **<u>The Application of the CSA to Defendants' Conduct is Not "Unsettled Within the Government."</u>**

Defendants Lovin and Aronson argue that they had no "fair warning" because the criminality of their conduct was "completely unsettled" within the Government. They cite three

distinguishable cases concerning tax evasion prosecutions, and argue that a lack of precedent, Congress's consideration of the bill discussed above, alleged advice they received from a DEA agent, and (somehow) alleged statements by their co-conspirator David Glass demonstrate that the law is "completely unsettled." Their argument is erroneous.

First, any claim that there is no relevant precedent indicating that the Defendants' conduct violated the CSA is simply untenable. As discussed in section III.B.3, *supra*, there is extensive case law finding that prescriptions issued without physical examinations, for drugs chosen by patients, are issued outside the usual course of professional practice. This principle was even applied to an Internet pharmacy virtually indistinguishable from Affpower in *Nelson* and *Fuchs*. Thus, the Defendants had ample notice that the prescriptions they were filling were issued outside the usual course of professional practice. That pharmacists are liable for filling prescriptions they know are issued outside the usual course of professional practice is similarly undisputable. *See Hayes*, 595 F.2d at 261; *Mahar*, 801 F.2d at 1487-88; *Leal*, 75 F.3d at 222-23; *United States v. Lawson*, 682 F.2d 480 (4th Cir. 1982). *See also* 21 C.F.R. 1306.04 (placing a "corresponding responsibility" on the pharmacist for ensuring that controlled substances are properly prescribed for a legitimate medical purpose and in the usual course of professional practice).

Putting aside their failure to consider *Nelson* and *Fuchs*, which address Internet pharmacies like Affpower, the Defendants again err by assuming that their use of the Internet makes their conduct uniquely different from identical off-line conduct. It does not. Just like pharmacist defendants in *Mahar* and *Leal*, Defendants Lovin and Aronson are liable for filling prescriptions that they knew were issued after perfunctory physical examinations. *Cf. Hilst*, No. 07-10079, slip op. at 14-15 (denying Internet pharmacy pharmacist's motion to dismiss). In light

of the extensive case law, and particularly *Nelson*'s application of the CSA in an Internet pharmacy context, the Defendants cannot claim that there is no precedent in this area or that the law is "unsettled."

Second, the Defendants' argument that application of the CSA is "unsettled" within the government is equally erroneous. For the reasons explored in Section III.C, *supra*, the Defendants cannot infer that Congress disagrees with the government's theory in this case nor argue that the Senate's current view is relevant. Without the faulty conclusion that there is disagreement between the legislative and executive branches, the Defendants' only purported evidence that the law is "unsettled" is the alleged advice they received from an unnamed DEA agent.

Defendants cannot simply rely on unsupported, vague assertions that a DEA agent told them "everything looked fine" after he "discussed the details of how and why [Defendants] were filling the prescriptions." It would be inappropriate for the Court to consider such unsubstantiated facts for a motion to dismiss. Assuming for the sake of argument that this alleged advice is relevant to the issue of fair notice, the Defendants have the burden of proving the facts that they proffer at a factual hearing. The Defendants' assertions here come unsupported by any testimonial declaration and without even sufficient details to evaluate the significance of the alleged advice. The Defendants have not identified the agent in question nor the date of the inspection. More importantly they do not describe the "procedures" or "computer set up" he inspected or the details that the Defendants furnished which supposedly led to his conclusion. Finally, they give little indication of what his actual advice was beyond asserting, without quoting, that he told them "everything looked fine." If the Court believes that the alleged advice the Defendants received could have created sufficient confusion over the legality

of their specific conduct to create a problem of fair notice, then the Court must at least conduct a factual hearing to determine what that advice actually was and in what context it was given.[17]

Finally, any alleged statements by the Defendants' co-conspirator, David Glass, are irrelevant to the issue of fair notice. Mr. Glass does not speak for the government, nor was he a government agent at the time of the alleged statements.[18] Nor would statements by their co-conspirator representing that Affpower's doctors were sufficiently reviewing online questionnaires or only issuing prescriptions "where medically authorized" relieve the Defendants of their duty under the law to ensure that they were only filling prescriptions issued in the usual course of professional practice. What advice Mr. Glass may have given to the Defendants, and

---

[17] The United States believes that the Defendants' assertions are false. Based on the Government's investigation, the DEA did not visit St. Vrain Pharmacy while Affpower was operating and never provided the advice alleged. DEA Diversion Inspectors did visit St. Vrain in November 2006, months after Affpower had ceased operation. Based on statements the Defendants made to the Diversion Investigators during that visit, it appears that the Defendants' motion is actually referring to an April 2006 inspection by Chris Gassam, an Investigator for the State of Colorado Board of Pharmacy, not the DEA. Based on the Government's investigation, Defendant Lovin initially advised Inspector Gassam that St. Vrain had been, but was no longer, filling Internet order. Upon further investigation, and contrary to Defendant Lovin's statement, Investigator Gassam discovered that St. Vrain was continuing to fill Internet orders. Investigator Gassam did not tell the Defendants, expressly or tacitly, that their filling of Internet prescriptions was legal; in fact, he specifically told the Defendants that their conduct was violating a Colorado Board of Pharmacy regulation passed in the fall of 2005. The United States expects to present this evidence at trial.

Since at least 2001, the DEA has provided guidance that distributing controlled substances over the Internet based on an online medical questionnaire without a physical examination exceeds the bounds of professional medical practice and constitutes a violation of the CSA. The DEA explained this position in a detailed letter sent to St. Vrain Pharmacy on March 14, 2005, and to over 60,000 other pharmacies in 2004 and 2005. The letter begins by answering the question, "Can an individual order drugs using the Internet without seeing a doctor?" by stating "Federal law requires that 'A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice' (21 CFR 1306.04(a)). Every state separately imposes the same requirement under its laws. Under Federal and state law, for a doctor to be acting in the usual course of professional practice, there must be a bona fide doctor/ patient relationship. . . . **A patient completing a questionnaire that is then reviewed by a physician hired by or working on behalf of an Internet pharmacy does not establish a doctor/patient relationship.**" (emphasis added). Later, the letter answers the question, "Does being an Internet pharmacy change a pharmacy's responsibilities under DEA regulations?" by stating **"No, Internet pharmacies are still authorized to sell controlled substances only when there is a valid prescription from a DEA-registered practitioner who issued the prescription in the usual course of his or her professional practice."** (emphasis added). The DEA stated the same position in guidance published in the Federal Register in 2001, which has been posted on its website since then.

[18] The Defendants do not indicate exactly what Mr. Glass told them, nor when the alleged statements were made. A review of the government's investigation reveals no statements by Mr. Glass to the Defendants during his cooperation with government agents that would indicate that Affpower's operation was legal.

whether any reliance on that advice was reasonable, are relevant, if at all, only to the issue of the Defendants' knowledge, which must be determined at trial.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, all three of the Defendants' motions to dismiss should be denied.

DATED:        August 11, 2008                    Respectfully submitted,

                                                            KAREN P. HEWITT
                                                            United States Attorney

                                            By:    <u>/s Jared M. Strauss          </u>
                                                            CORBIN A. WEISS
                                                            Senior Counsel, U.S. Dep't of Justice
                                                               Criminal Division, CCIPS
                                                            Special Assistant U.S. Attorney
                                                            E-mail: corbin.weiss@usdoj.gov

                                                            JARED M. STRAUSS
                                                            Trial Attorney, U.S. Dep't of Justice
                                                               Criminal Division, CCIPS
                                                            Special Assistant U.S. Attorney
                                                            E-mail: jared.strauss@usdoj.gov

                                                            MICHELLE J. KANE
                                                            Trial Attorney, U.S. Dep't of Justice
                                                               Criminal Division, CCIPS
                                                            Special Assistant U.S. Attorney
                                                             E-mail: michelle.kane@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that I am an employee of the United States Department of Justice and that a copy of the foregoing GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS FOR VAGUENESS was electronically filed this 11th day of August, 2008, thereby transmitting a Notice of Electronic Filing to all parties named below.

John C. Lemon
Law Offices of John C. Lemon, APC
1350 Columbia Street, Suite 600
San Diego, California 92101

David Finn
Milner & Finn
2828 N. Harwood St.
Ste. 1950; LB 9
Dallas, Texas 75201

F. Clinton Broden
Broden & Mickelsen
2707 Hibernia Street
Dallas, Texas 75204

Marc X. Carlos
Bardsley & Carlos L.L.P.
424 "F" Street, Suite A
San Diego, California 92101

John C. Ellis, Jr.
Federal Defenders of San Diego, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008

Ellis M. Johnston, III
Federal Defenders of San Diego, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008

Michael P. Gibson
Burleson, Pate & Gibson, LLP
2414 N. Akard, Suite 700
Dallas, Texas 75201

Patrick Q. Hall
Seltzer Caplan McMahon Vitek
750 B Street
Suite 2100
San Diego, California 92101-4605

Michael J. Uhl
Fitzpartrick, Hagood, Smith & Uhl, LLP
2515 McKinney Ave., Suite 1400
Dallas, Texas 75201

s/ Jared M. Strauss
JARED M. STRAUSS
Special Assistant U.S. Attorney